Good morning, your honors. Mr. Olejniczak for Douglas Dynamics. I tried. Say it again for us. Olejniczak. Olejniczak. Please proceed. May it please the court. Good morning, your honors. I'd like to focus on two errors made by the district court today. The error in finding that BUYERS PRODUCTS did not infringe the reissued 700 patent, and also the failure of the district court to grant an injunction. Is the theory that if it infringes the third patent, then there would be additional damages? Your honor, yes, that's correct. The 700 patent is the patent that there would be additional damages. Okay. The error... This is the connected issue. With respect to Claim 45, it's the connected issue. Yes, your honor. And if I could, I'd focus on Claim 45 because Claim 45 does not include the additional issue of Independent Claims 1 and 38. Although all three of those claims do include this connected issue. But with respect to the language wherein the A-frame and the support frame are connected to the mounting frame, the court erred by reading in two limitations into that claim language. One, that the A-frame and the support frame both be connected to the mount frame. And two, that that connection be a direct connection. And neither of those limitations are found in the plain language of the claims. And the law is clear that if there is no lexicography, if there is no disclaimer, and none of that was argued by Byers Products Company, then the plain and ordinary meaning of the claim language should apply. And the language of the claims themselves provide us with a further indication as to why this connection is a broadly claimed connection. In other words, it could cover a direct connection, it could cover an indirect connection. And the reason is that there is further language in the claim that recites that the A-frame and the mount frame be connected, the A-frame and the support frame be connected to the mount frame as a unit to allow for pivotal movement. Now that language as a unit informs us that this connection does not need to be strictly limited to the direct connection or the separate indirect connection as the court erroneously found. And the patentee was clear in demonstrating that it knew how to claim a direct connection if it wanted to. In claims 27 and 41 of the patent, it used the language point of attachment to convey and claim the idea of a direct attachment or direct connection. It did not use that language in the independent claims. Instead, it more broadly used the language of a connection. And this idea of the connection of the A-frame and the support frame or lift frame, as it's called in claims 1 and 38, is also supported by the intrinsic evidence. It's supported strongly in the language of part 2 of the patent describing the object of the invention as attaching as a unit. Again, the whole idea was an improvement over the prior art where the lift frame was left on the vehicle. Now, with this invention, you had a connection of the sub-assembly of the A-frame, the lift frame, the snow plow as a sub-assembly unit that can be attached and detached and leave variable structure on the vehicle as you drive around. It improved safety and it improved the ability for users to store and drive around with this equipment. Now, I thought all of the drawings showed a direct connection. Is that correct? Your Honor, all of the drawings in the patent does not show a direct connection between both the A-frame and the lift frame or support frame and the mounting frame. There's figures 6 and 7. That uses the hitch arm, right, as the indirect connection? That is correct, Your Honor, in that embodiment. And it's shown on page 38 of the blue brief. There is an intervening structure in between the lift frame and the mount frame to allow attachment of the lift frame to the mount frame. So in that respect, the court's error is clearly erroneous because the court was, the court erred because that would not read on its limited view of the claim language which would require separate and direct attachment of both the A-frame and the lift frame to the mount frame. Could you go on to the injunction issue? Certainly, Your Honor. With respect to the injunction, the court found that two different Douglas patents were infringed. This is the 978 patent and the 530 patent. Now, those patents are not subject to this appeal, and the final judgment has been entered on those two patents. And, in fact, Byers has satisfied that judgment on those two patents. The issue is, though... ...suggesting that there's market segmentation and no direct competition. What militates against that? Well, Your Honor, the fact of the matter is the evidence at trial showed that there is direct competition between my client, Douglas, and Byers Products Company, just as there is competition between Ford and Mercedes-Benz in the sale of cars. And the fact of the matter is, if an infringer decides to come in and use patented technology and sell a product at a lower price, that does not justify infringement. And it's particularly egregious in the case where the two parties are direct competitors and they both practice the patented technology. And in that respect, I respectfully submit that the Bosch v. Pylon case that this court has decided is instructive in that matter. And in that case, this court found that the wisdom of the past is particularly apt in traditional cases where the patentee and an adjudged infringer both practice the patented technology. And here, that is the case. Both Douglas and Byers compete in the same market for snow plows. And Byers used Douglas' patented technology to break into that market and to harm Douglas with its infringement. And that leads us to this idea of irreparable harm. And we believe that certainly the idea that just because you sell a lower-priced product or a lower-quality product does not erase the irreparable harm that my client has endured. What relevance does your unwillingness to license have here? Well, I think Douglas' history, and they have a long history of no licensing and a long history of maintaining exclusivity, that helps demonstrate that this technology is important to Douglas. It helps demonstrate that this technology has created a significant amount of goodwill in my client's products. And that is important because this harm to goodwill also is a factor in irreparable harm and it's also a factor in demonstrating that there's not an adequacy of monetary damages in this case. And again, it goes back to the case, if Ford was able to just take all of Mercedes-Benz technology and put it on any car that they wanted to, then what benefit or what incentive does Mercedes-Benz have to innovate, to continue to develop the technology? And that's the case here. It's true that Douglas Dynamics is the leader in the snow plow industry, but it's also true that they desire to continue innovating, to continue investing their funds. How would you be harmed by competition from buyers? Well, we were harmed in several ways. Our market share stopped growing. There was a complete flatline of the market share once buyers entered the market. And that is a traditional, in the Celsius in vitro case, that case demonstrates that this type of harm, harm to market share, and also the harm to goodwill that I mentioned, are the types of irreparable harm that are present in injunction cases such as this. But again, the harm to the goodwill is significant because this technology that my client developed and sold his plows with is also the technology that it markets to its consumers. In other words, the 978 patent, which is one of the patents that was found and it judged in fringe, is also called in the marketplace the Minute Mount II. And customers purchase that product based on this attachment and detachment technology. So for a competitor to come in to steal that technology and put it on their plows and be able to market their plows with the same advantages, that is detrimental and harmful to my client. And I submit that is irreparable harm. Now, the standard that the district court set with justifying no irreparable harm on the basis of having a lower priced product, that really seems to be an impossible standard to meet. It appears that if any infringer could just walk in and not invest in research and development, not invest in developing this technology, then of course they're going to be able to sell the product at a lower price. Of course they're going to be able to undercut the market. So the reasoning just does not seem apt. And in fact, there is precedent in this court for that theory. It's the Payless Shoe Source case v. Reebok from 1993, which states that selling a lower priced product does not justify infringing the patent. Your Honor, I will rest on the briefs for the remaining issues in this case, and I would like to reserve my remaining time for rebuttal. Thank you, Mr. Olejniczak. And we'll hear from Mr. Tucker. You may please the court. I'm Todd Tucker, and I'm here representing the Apple League Buyers Products. Buyers Products Snow Dog plows are the opposite of the asserted claims of the 700 patent. You can see this in the joint appendix at 3634 or on page 17 of the Apple Ease brief, where there's a color illustration. What Buyers Snow Dog plows are is an A-frame connected to a lift frame, the lift frame then connected to the mount frame. The mount frame's under the truck. And both are connected, aren't they? Which are both connected? I'm sorry, Your Honor. Both are connected to the mount frame. No, the A-frame is not connected to the mount frame. It's only connected to the lift frame. They're both connected to the mount frame. You're just, the connection is indirect in the instance of going through the A-frame with your device, right? I would agree with you that they're indirect. Well, but the patent doesn't say indirect, does it? It just says connected. Yes, Your Honor, but the patent, it never mentions indirect. With the patent, every time it uses connection, or the word connect, except once, over 60 times, it illustrates or refers to a direct connection. It shows, for instance, in Figure 2, the A-frame connected to the mount frame. Does the specification ever reject indirect connection? It refers quite repetitively to direct connections here and there. But does it reject an indirect connection? Connection is such a broad term that you'd expect them to make a distinction if they mean one. Well, they do have a distinction in Column 4. If I can jump ahead. Column 4, lines 49 to 53, which in the appendix is 2730, it says there that at one point the inventors understand they're talking about an indirect connection, and they're very clear there. When they say a snowplow assembly 18, including a snowplow blade 20, is connectable to the mounting frame assembly through an A-frame, that is showing that they understood what indirect connection is. And that's the only place in the specification where they use indirect connection. And when we look at the Phillips case, that gives us... Your opponent says that Figure 6 and 7 show an indirect connection. Do you disagree with that? I disagree with that. That shows a series of direct connections. In every one of these illustrations, every one of the figures, it shows Piece A directly connected to Piece 2, which in turn could be directly connected to Piece 3. If you look at Figure 6, it is showing the support frame is directly connected to a hitch arm. And then at another end of the hitch arm, that is directly connected to the mounting frame. If Claim 45 was going to cover an indirect connection, they would have said so. If they were going to cover, perhaps, Figure 6, they would probably have the hitch arm in there. I also would like to point the court to a line in the spec that seems pretty important. In column 4, lines 57 and 58, it reads, Mounting frame assembly 16 is connected to the A-frame and to the lift frame assembly 24. What's interesting there is the 2, where it says, and to the lift frame assembly, that's in italics. That was added by the inventors in the reissue. That's where they were trying to make sure everyone clearly understood their invention. And by adding that second 2, they are saying, in our claims, both the A-frame is connected to the mounting frame and the lift frame is connected. That implies a separate indirect connection for each. It cannot be connected through. Also, there's no mention, nowhere in the specification of this patent, does it ever have an embodiment where the lift frame is indirectly connected through the A-frame or vice versa. Nowhere in there. There's always a separate connection. Switching to the injunction issue for a moment, your expert actually admitted that there's competition. In the face of record evidence of direct competition, how can we ignore that there's irreparable harm? Well, first off with the injunction, I'd like to note that I believe the 530 patent expired this past September, so I'm not sure why we would still have an injunction on that. But while our expert did say there was competition, in the appendix at A-4, the district court cites to testimony, I believe it was SEC filings, where Douglas showed during the entire time buyers was in the marketplace, Douglas' market share actually increased about 1% a year. And it should have increased by 10% a year if they'd had market exclusivity. That doesn't tell us much, does it? Well, I think... I mean, those kinds of figures are almost irrelevant, unless you could somehow extract the infringer from the market and then show that these figures remain the same, and of course, we can't do that. The lower price, which is the district court's main argument, shows almost exactly the opposite, doesn't it? Well, if at a lower price, you'd expect someone to come in at a lower price when they haven't invested in R&D or technology innovation at all. I think the evidence on the record, however, shows that buyers created a new market segment that Douglas really wasn't servicing before, and there was testimony to that. Again... A new market segment by undercutting the price of the innovative product. That's the definition of infringement. Why do we give... Why would we allow to... Why would we expunge the exclusive right, the right to exclude in those circumstances where you undercut the price of the innovative product? Well, when we focus on whether there's irreparable harm or not, when you have an entire new market segment is being created... And isn't almost the definition of that, when somebody comes in and undercuts your price with a competitive product? The record shows this is a competitive product and it undercuts the price. I'm struggling to understand your argument. But there was also, and this is what the district court relied on, there was statistical evidence, and I believe it's referenced in the joint appendix at A3, that a customer going to buy a Douglas snowplow would most likely not decide to purchase a buyer's snowplow. And that's why there was no true competition. Because it's easier, because they buy the cheaper price, because they undercut as the infringer, right? I respectfully disagree, Your Honor. Douglas has never serviced... Is there anything in the record that contradicts that? Again, there is evidence at A3 and A4 that there was a new market segment created. There's also evidence at A4 that... A new market created by the infringement, though. Our objective in creating remedies is to remove the infringement from the market and try and restore the innovator to the place they would have achieved without that infringement. Now, how are we doing that? It's not a situation where you're undercutting to steal sales. There was very, very, very little evidence, if any at all, of buyers actually taking a Douglas sale. So this is an entire different realm of sales that had not been available before. In fact, I believe at A4, the appendix, the district court also references testimony where Douglas was unable to point to a single lost customer due to buyers' presence. So it's slightly different than the situation where someone's just undercutting you to take away your patent and invention. What it is, is it was a whole new segment that didn't exist before then. So that's why there's no irreparable harm. What makes it a different segment? It's heavily on the price point, Your Honor. It's price. Yes, I agree. That's right back to where we were before. You're able to undercut the price because you're infringing. Help me out with the circularity of your reasoning here. Again, it's not that you're taking away their sales. No, you've got a different price because you're infringing. But if I take the infringement out of this equation, how do I reach your conclusion? If there were no patent, buyers would be selling over here in this part of the market that Douglas never reached out to. And then Douglas was up here at the higher end. There's a big gulf between them. And that's why the sales that buyers are making over here, they're not irreparable harm that would warrant a permanent injunction. It's just that they should be the post-verdict royalty. You'd like to remove the patent from the market, not the infringer from the market. Well, I'm just giving a hypothetical. I understand. Your hypothetical goes kind of exactly contrary to the law, doesn't it? We try to remove the infringer from the market, not the patent from the market. Yes, but first and foremost under eBay, when we have to look for the irreparable harm, is there truly irreparable harm when there's no lawsuit? And the problem you have is there's direct competition and testimony even from your expert of direct competition. How can you escape some irreparable harm when there's direct competition, you're undercutting the price, and you're infringing? Our expert did indeed say there was direct competition. But there's no lost sales. So I'm not really sure if we're going to measure competition as lost sales, which seems to be the most quantifiable way to do it. There is no lost sales. So that would cut against perhaps irreparable harm. That's an interesting point too. Is competition simply lost sales? What about lost reputation and their preeminence as the innovator in the market is somehow undercut because the tourist comes in and says we can do the same job as the Mercedes. Buy us. I don't know, Your Honor, but the court did note, again, Appendix A3. We have to know, don't you? I mean, you don't know. Don't you have to have an answer for that question? Otherwise there's irreparable harm, and we've got to send it back and have the court take another look at it. Well, in the perhaps short circuit, this is also, I believe it's in the briefs, buyers designed around and isn't even selling the plow that's been found to infringe, and there's been no complaint by Douglas that the design around infringes. Perhaps I should have jumped out earlier and said that because it does seem to cut against. It may be a moot point, I guess, in that regard. I would like to also point out, if I may, that the district court, it got it right in plain construction. What the district court did was, using Phillips as a guide, it went to the specification, read through the specification, and came up with its constructions. What Douglas would have us do here, as seen on page 30 of their brief at footnote 4, is use general dictionary definitions to trump the specification. And it's interesting, their support for that, they cite the Texas digital case and the Inverness medical case, which were expressly rejected in the Phillips holding. So I think the entire claim construction they're trying to espouse is built on relatively shaky grounds. Another item that I'd briefly like to address before I sum up is they have also appealed the reasonable royalty, the post-verdict reasonable royalty, on the basis that the court, in using other factors, did use the rule of thumb. And I know that, I believe it was about a month ago, this court held in Energy Transportation Group v. William DeMont Holdings that the 25% rule of thumb does not irretrievably ruin or damage a reasonable royalty analysis. I don't have a cite for that because it's not upon Westlaw yet. So I would point out that it's harmless error at worst on the rule of thumb. To sum up, if I may, the district court's finding where they use the specification as a guide to determine that there is no infringement, that an opposite cannot infringe is correct. Everything in the specification, over 60 times, when it's using connection, is showing a direct connection. Douglas has put forth great machinations in their brief using outdated case law that's been rejected to come up with their construction. They haven't moved for a doctrine of equivalence infringement because they know under SCIMED and more that an opposite, such as the buyer's opposite of the 700, that can't be an equivalent. This court would have Douglas jettison Phillips and let general dictionaries trump the specification. I think, simply put, Douglas is trying to prove too much. The district court's finding of non-infringement was correct and should be affirmed. Thank you. Thank you, Mr. Parker. Mr. Olanidji. Thank you, Your Honors. I'd like to point out two things on rebuttal. First, Douglas did not use the specification or dictionary definitions as a guide in advocating for the claim construction that espouses this broad connection language. That language is from the claims themselves. The claims themselves use the plain and ordinary meaning of the word connection and further indicate that that connection is a connection between the lift frame and the A-frame as a unit to the mount frame. That is clear. That is what is shown in the 700 patent and that is what buyer's infringing product does. Mr. Tucker mentioned that one of the patents is expired. Is the injunction issue still alive? With respect to the 530 patent, that patent has expired and the injunction issue is not alive with respect to that patent. But the 978 patent does not expire until 2021 and the injunction issue is very well alive with respect to that patent. And Mr. Tucker made the point that because they have designed around, allegedly designed around this patent, that it's now a moot point. Well, it's not. The patent that Douglas has, the 978 patent, it confers a right to exclude and that right should be acknowledged by district courts, particularly for a young patent such as this. Buyers should not be allowed to subsequently design around and then have the opportunity to go back at a low royalty rate or for whatever reason. They should be enjoined from using that technology because they have misappropriated it. Now, is that what happened here, that their product was changed and then is being restored to its prior form because of the royalty? I believe, Your Honor, that the product has been changed since the infringement. There are still issues of post-judgment sales of infringing products, but they have changed the product since then. What the injunction would prevent is the ability for buyers to subsequently go back and use this innovative technology patented in the 978 patent. And we believe that is a right that should be acknowledged by the district court and that this court has the opportunity to inform the district court that that right is alive and well with respect to patents. I'd like to sum up very quickly, Your Honors. We believe that the 700 patent is infringed and that the court abuses discretion. We would request that this court direct a judgment of infringement of the 700 patent and we'd also request that this court direct the district court to enter an injunction on the 978 patent. Thank you. Thank you very much.